# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DOUGLAS S. MICKEY,
           *Petitioner-Appellant,*

v.

ROBERT L. AYERS, For California
State Prison at San Quentin,
           *Respondent-Appellee.*

No. 07-99006

D.C. No.
CV-93-00243-RMW

---

DOUGLAS S. MICKEY,
           *Petitioner-Appellee,*

v.

ROBERT L. AYERS, For California
State Prison at San Quentin,
           *Respondent-Appellant.*

No. 07-99007

D.C. No.
CV-93-00243-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
December 9, 2009—San Francisco, California

Filed June 7, 2010

Before: Diarmuid F. O'Scannlain, Johnnie B. Rawlinson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

8085

## COUNSEL

J. Frank McCabe, San Francisco, California, and Neoma D. Kenwood, Berkeley, California, filed the briefs and argued the cause for the petitioner-appellant-cross-appellee.

Alice B. Lustre, Deputy Att'y General of California, argued the cause and filed the brief for the respondent-appellee-cross-appellant. Edmund G. Brown, Jr., Attorney General of California, Gerald A. Engler, Senior Assistant Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General of California, and Glenn R. Pruden, Deputy Attorney General of California also were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We consider an appeal and a cross-appeal presenting consolidated issues arising out of a California double murder conviction and death sentence.

### I

### A

A California jury convicted Douglas S. Mickey of two first-degree murders, making special circumstance findings that authorized the death penalty. The state court jury returned a death verdict. The facts, as aptly discussed by the California Supreme Court in *People v. Mickey*, 54 Cal. 3d 612 (1991), and undisputed by the parties, can be summarized as follows:

### 1

In September 1980, Mickey lived on an Air Force base in Japan with his wife, who worked as a nurse, and her two children. Mickey did not have a job and his family was experiencing financial difficulties. On September 17, 1980, Mickey flew to California, his home state. He stayed with Edward Rogers, a longtime friend. Mickey disclosed to Rogers that he traveled to California in order to rob and murder Eric Lee

Hanson. After that, Mickey planned to travel to Alaska to kill his wife's ex-husband in order to obtain life insurance proceeds for his wife and children, who were beneficiaries under the policy. Although Hanson, a drug dealer, was a longtime friend of his, Mickey had a grudge against him. Mickey believed that Hanson had stolen some of Mickey's personal property. As a result, Mickey had stolen some of Hanson's marijuana crop, burying it in the ground. When Mickey returned to California, he retrieved the stolen loot and began consuming it, along with alcohol.

On September 22, Mickey drove to Hanson's home in Placer County in a car he borrowed from Rogers, arriving around 11 p.m. He armed himself with a rifle, also borrowed from Rogers, to which Mickey attached a homemade silencer. Mickey stayed overnight with Hanson and his girlfriend, Catherine Blount. Though Mickey observed Hanson counting a wad of money, he did not act on his plan to kill Hanson, and he left the next day.

On September 28, Rogers dropped Mickey off at Hanson's home, around midnight. This time, Rogers and Mickey established a rendez-vous point at a public telephone booth a few miles from Hanson's home. Mickey had armed himself with his own knife and Rogers's pistol. Hanson and Blount invited Mickey inside the home.

Shortly thereafter, Mickey murdered Hanson and Blount. He first bludgeoned Hanson with a baseball bat and slit his throat from ear to ear down to the spinal cord. He then stabbed Blount seven times in the chest. Three of the blows pierced her heart. Mickey left the house, taking substantial property with him, and drove away in Hanson's Volkswagen. He left no fingerprints.

Mickey then met up with Rogers. They transferred the stolen property to Rogers' pick-up truck and wiped the Volkswagen clean of fingerprints. Rogers convinced Mickey not to

go back and burn the house to the ground. They abandoned the Volkswagen and returned to Rogers' house. They stashed the goods and Mickey tended to a wound suffered during the murders. The next day, September 30, Mickey fled to Japan.

2

Within a few days, the State secured a statement from Rogers implicating himself and Mickey in the crimes, in exchange for Rogers' immunity. The State soon thereafter filed a complaint against Mickey for the double homicide, alleging five special circumstances making the crimes capital offenses. Sheriff Donald Nunes traveled to Japan, where Mickey was arrested on October 14, 1980. Nunes advised Mickey of his *Miranda* rights and Mickey declined to speak at that time, asking to speak to a friend who was an attorney. Although Mickey desired to waive extradition, the Japanese government would not permit a waiver.

3

Mickey sat in a Japanese prison until 1981. On January 12 of that year, federal marshal Robert LaRoche arrived with Sheriff Nunes and Detective Curtis Landry and, more importantly, an extradition warrant. Nunes and Landry accompanied LaRoche in order to collect evidence and to interview witnesses. On January 16, 1981, at about 3:30 p.m. Tokyo time, LaRoche, Nunes, Landry, and Mickey began the journey back to California. The law enforcement officials picked up Mickey from the Japanese detention center. Mickey was alert, healthy, jovial, and talkative, and engaged in small talk with Nunes, whom he recognized. Mickey continued to initiate small talk with Nunes on the three-hour ride to the Tokyo airport.

Around 8 p.m. Tokyo time, after waiting about an hour at the airport, Landry, who suffered from halitosis, offered Mickey a mint for Mickey's bad breath. The mint came from

a bowl in Mickey's wife's house, which Landry had visited the prior day to conduct an interview. After Mickey appeared to recognize the mint, Landry asked Mickey if he knew its origin. Mickey said yes and put his head in his hands. The group then boarded the plane. Mickey sat next to Nunes and resumed small talk. He spoke of his family and hobbies and was generally pleasant and talkative. He expressed no signs of grief.

Nunes later switched seats with Landry to take a nap. Landry and Mickey then enjoyed several cups of coffee, and Mickey picked up where he left off with Nunes. He spoke of philosophy, politics, food, football, family, and California. He asked Landry about his family. Landry answered, and eventually, in the course of discussion, referenced that he watched Mickey play high-school football and knew of his brother's suicide. About two hours later, Mickey suddenly asked Landry whether Hanson and Blount were buried together. Landry replied that they had been cremated and their ashes scattered. At this point, Mickey started crying uncontrollably. He said that nothing would have happened if Hanson had not reacted as he had to the news of Mickey's theft of Hanson's marijuana crop. This lasted about twenty minutes. Landry did nothing. An hour later, Mickey resumed conversing about his family, his hobbies, and politics. The plane then landed in Hawaii, around 1:30 a.m. Tokyo time (6:30 a.m. Hawaii time). Mickey said to Landry, "Curt, I would like to continue our conversation at a later time." Landry replied, "Fine, yes."

After Mickey was checked into a Honolulu jail, LaRoche, Nunes, and Landry discussed what to do. Nunes called the Placer County District Attorney's office, which told him to ask Mickey if he wanted to speak and, if Mickey said yes, to *Mirandize* and then to interrogate him. Landry did so, starting the interrogation at 12:42 p.m. Hawaii time, or 7:42 a.m. Tokyo time. Mickey confirmed that he had requested the conversation and then waived his *Miranda* rights. During the four-hour interrogation, Mickey was alert and aware and lost

and regained his composure several times. His answers to Landry's questions implicated himself in the murders and the planning. The next day, the group returned to California, where Mickey was incarcerated. While in prison there, he made further statements regarding his role in planning and executing the murders to a jailhouse informant.

## B

The trial did not begin until two and a half years later.[1]

### 1

The guilt phase trial began on June 21, 1983 and ran until July 20, 1983. At trial, the prosecution relied on Mickey's statements to police officers, family and friends, Edward Rogers, and a jailhouse informant. The State also introduced some of the letters Mickey penned to his wife, which showed his financial motive for the murders. And it introduced numerous photographs of the crime scene.

Mickey provided very little resistance in the way of a defense, likely because, as counsel told the trial judge before trial started, the strategy was to focus on the penalty phase because of the overwhelming evidence of guilt. Mickey did not testify and merely contested whether the prosecution met its burden as to the required mental state. He pointed to his statements, admitted by the prosecution, as evidence of self-defense or diminished capacity from voluntary intoxication. The jury convicted Mickey of both murders in the first degree and, for each of the murders, made special circumstance find-

---

[1]Mickey was represented by Fred P. Tuttle III and Lyle H. Shattuck throughout this time period. The trial was originally set for November 9, 1981, but the state and the defense jointly sought and obtained a continuance of six months. The defense successfully sought further continuances.

ings of multiple murders, intentional murder for financial gain, felony-murder-robbery, and felony-murder-burglary.[2]

At the penalty phase, the prosecution largely rested on the nature of the crimes themselves, although it did attempt to prove prior domestic abuse through testimony of Mickey's ex-wives. Mickey, however, put on what the California Supreme Court called "substantial" evidence in mitigation. *Mickey*, 54 Cal. 3d at 639. Thirty lay witnesses testified as to their interaction with Mickey. Without exception, all portrayed him as a good, loving, hardworking child and youth. Notably lacking from the penalty phase was any mention of Mickey's pattern of sexual exhibitionism in his youth and young adulthood, which culminated in two and a half years of sexual abuse of his step-daughter immediately prior to the murders. The defense successfully excluded this evidence.

Instead, defense counsel cast Mickey as a good child who began drifting through life after experiencing tragedy. Defense counsel told the jury of the death of Mickey's half-brother in an automobile accident when Mickey was five years of age. Defense counsel also emphasized the death of his mother, a possible suicide, in an automobile accident when Mickey was seventeen years old, and conveyed that Mickey was very close to his mother and felt the loss deeply, turning to alcohol to dull the pain. Counsel also showed the jury that soon after that Mickey's grandfather died, and after that, his brother committed suicide.

Counsel argued that, as a result of these experiences, Mickey began abusing drugs, eventually branching out from the alcohol he abused after his mother's death into more serious drugs like marijuana, mushrooms, PCP, and LSD. Mickey became entangled with the drug culture, through which he met Hanson. Two experts, Drs. Jules Burstein and David

---

[2]The fifth special circumstance allegation—of a heinous, atrocious, or cruel murder—was set aside by the trial judge prior to trial.

Smith, explained the effect of the drug abuse on Mickey. Both testified that Mickey lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to law at the time of the murders because of "polysubstance" drug abuse combined with a delusional system in which Hanson was the oppressive master and Mickey the apprentice. They based their findings largely on interviews with Mickey himself. The prosecution produced its own expert on rebuttal to counter Burstein and Smith.

Despite this thirty-witness presentation, the jury returned a death verdict.

2

Mickey appealed his convictions to the California Supreme Court. He raised numerous issues arising from the guilt and penalty phases. The California Supreme Court affirmed the judgment in a thorough, ninety-five-page opinion. *Mickey*, 54 Cal. 3d at 612. It did rule for Mickey on two minor issues, holding that Mickey was eligible for only one of the multiple murder special circumstance findings because one case could only support one such finding, no matter how many murders. *Id.* at 678. It also held that the murder-for-financial gain special circumstance findings were inappropriate because the murder was committed neither as a murder-for-hire nor for insurance proceeds. *Id.* at 678-79. Neither of these two holdings affected the ultimate affirmance of the death penalty because the remaining special circumstance findings were upheld.

Relevant for our purposes, the California Supreme Court rejected Mickey's argument that the trial judge erroneously denied his motion to suppress his in-flight and Hawaii admissions. The court held that there was no due process violation for the in-flight admissions because there was no state coercion. Rather, the defendant initiated the discussion. The same was true of the Hawaii admissions. Moreover, it held that

there was no *Miranda* violation with respect to the in-flight admissions because there was no custodial interrogation. And there was no *Miranda* violation for the Hawaii admissions because the defendant started the conversation.

The Supreme Court of the United States denied certiorari. *Mickey v. California*, 506 U.S. 819 (1992).

3

Mickey then began pursuing federal habeas relief. After he successfully moved for a stay of his execution and appointment of counsel, he filed a petition for a writ of habeas corpus in 1995. Proceedings on that petition were stayed pending exhaustion of certain claims in state court, which was completed in 1996. Mickey also filed for postconviction relief in the California Supreme Court challenging his death sentence, but that petition was denied in 1997.

Mickey filed an amended federal habeas petition at the end of 1997, raising numerous claims. The district court awarded summary judgment to the state on all but three of his claims. To evaluate these remaining claims, the district court held an evidentiary hearing, which included testimony by a new social historian, David Lisak; a new expert, Dr. Donald Stonefield; the two original penalty phase experts, Burstein and Smith; and various other new and old lay witnesses. The district court then denied the petition for a writ of habeas corpus with respect to the voluntariness of incriminating statements claim and the guilt phase ineffective assistance of counsel claim, but granted the petition for a writ of habeas corpus with respect to the penalty-phase ineffective assistance of counsel claim.

The district court granted certificates of appealability ("COA") on the ineffective assistance of counsel claims at the guilt and penalty phases. Mickey appeals the district court's ruling on ineffective assistance at the guilt phase. The state

cross-appeals the district court's ruling on ineffective assistance at the penalty phase. Mickey's opening brief requested a COA on the inadmissibility claim involving the extrajudicial incriminating statements, which we granted.

## II

Mickey first claims that his statements on the plane from Tokyo to Hawaii and in the Hawaii jail are constitutionally inadmissible. In Mickey's view, his right against involuntary admissions under the Due Process Clause of the Fourteenth Amendment, *Brown v. Mississippi*, 297 U.S. 278 (1936), was violated because he was coerced by mistreatment in Japan and by a mental illness he suffered. Mickey also argues his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated because he was reinterrogated after invoking his right to counsel and involuntarily waived his rights.

Since Mickey filed his petition for a writ of habeas corpus before the enactment of AEDPA, we review Mickey's claims under pre-AEDPA standards. State court findings of fact, including whether a waiver of *Miranda* was knowing and intelligent, are thus accorded a "presumption of correctness." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc). However, we review the voluntariness of a confession or *Miranda* waiver de novo. *Id.* at 415-16.

## A

We turn first to Mickey's Due Process Clause claim. Mickey argues his in-flight and Hawaii statements were involuntary for two reasons. First, he alleges coercion by poor conditions and a lack of contact with his family in the Japanese prison in which he was incarcerated pending extradition. Mickey also points to Landry's gift of a mint in the Tokyo airport, which Mickey correctly recognized as coming from a bowl of mints in his wife's home.

1

**[1]** An admission "is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008) (quoting *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003)). We look to see "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (internal quotation marks omitted). When assessing the voluntariness of an admission, we consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 434; *see Shi*, 525 F.3d at 730.

**[2]** Here, we agree with the district court that the Japanese prison conditions did not overcome Mickey's will. As an initial matter, we agree with the district court that Mickey exaggerates his prison conditions. His family, for example, visited him three or four times while he was in prison, and the other abuses he alleges are unsupported by the record. Moreover, the California Supreme Court affirmed, and the district court agreed, that when the officers picked Mickey up from the Japanese prison and transported him to Hawaii, Mickey "was alert and in good health; he was also jovial and extremely talkative." *Mickey*, 53 Cal. 3d at 643. He was so talkative that the federal marshal hoped he would stop talking. This behavior continued on the plane, where Mickey directed a running conversation with whomever was the occupant of his airplane row. Throughout this trip, the officers did not threaten Mickey physically or psychologically. In fact, they did not ask him any questions. The officers merely reciprocated Mickey's desire to engage in "small talk" about traffic, philosophy, politics, and mutual acquaintances in California. We cannot rule that Mickey's will was "overborne" by these normal prison conditions, which the evidence shows Mickey weathered quite well, in light of our case law holding incriminating statements in far worse conditions were voluntary. *E.g.*, *Shi*,

525 F.3d at 719 (holding that incriminating statement issued after nineteen-hour confinement by a native Chinese speaker on a ship was voluntary).

**[3]** Even if we believed Mickey's account, it is well-established that "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In other words, "[t]here must be some causal connection between the police conduct and the confession." *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir. 1992). We are satisfied that the actions of the Japanese prison officials are not at all connected to the behavior of American police.

2

**[4]** Mickey also argues that Landry's gift of a mint from Mickey's home undermined the voluntariness of Mickey's confession by "softening up" Mickey. But the totality of the circumstances convince us that Mickey's will was not overborne by the gift. The mint was given at 8 p.m., but the first incriminating statement did not occur until four hours later, with several hours of calm small talk that continued the earlier small talk intervening. Given that Mickey acted the same before and after the mint, it is hard to see how the mint is "causally related" to Mickey's statements. *Connelly*, 479 U.S. at 164. Additionally, this type of behavior is a far cry from the type of police behavior typically associated with coercion. *E.g.*, *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (police withheld food and prevented sleep during eighteen-hour interrogation); *Beecher v. Alabama*, 389 U.S. 35 (1967) (police officers held gun to the head of wounded individual to extract confession); *Davis v. North Carolina*, 384 U.S. 737 (1966) (police placed individual in closed cell without windows, provide limited food, and use coercive tactics for sixteen days). We conclude that Mickey's in-flight statements were voluntary.

**[5]** There is nothing in the record to suggest any additional physical or psychological coercion accompanied Mickey's admissions in Hawaii, which occurred in a standard police interrogation after Mickey asked to speak with Detective Landry. Mickey at times suggests he was excessively fatigued at the time of the statements due to the flight. But we have held that statements of defendants in far worse health were not involuntary. *Kelley*, 953 F.2d at 564-65 (statements from a handcuffed suspect in heroin withdrawal); *United States v. Lewis*, 833 F.2d 1380 (9th Cir. 1987) (statements after defendant was administered a general anaesthetic); *United States v. Martin*, 781 F.2d 671 (9th Cir. 1985) (statements of a groggy defendant under the influence of Demerol). Here, by contrast, Mickey has not overcome the presumption of correctness of the state court finding that Mickey was "alert and aware" during the Hawaii interrogation. Since Mickey's will was not overborne by the Hawaii trip, his statements in Hawaii also were not involuntary for purposes of the Due Process Clause.

B

Second, we consider Mickey's claims that his in-flight and Hawaii statements were taken in violation of his Fifth Amendment *Miranda* rights. Mickey argues that he was interrogated on the plane to Hawaii and in the Hawaii jail notwithstanding invoking his right to counsel in Japan. Mickey also argues his *Miranda* waiver in Hawaii was involuntary.

**[6]** A suspect who invokes the right to counsel may not be interrogated unless he initiates the conversation. *Edwards v. Arizona*, 451 U.S. 477 (1981). Mickey told Nunes at the time of his arrest that he did not want to speak without first consulting a friend, who was an attorney. We assume this constitutes an invocation of the right to counsel under *Edwards*.

**[7]** *Miranda* and *Edwards*, however, only apply to interrogations, which consist of "any words or actions on the part of the police (other than those normally attendant to arrest and

custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response. *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) ("Incriminating statements made in the course of casual conversation are not products of a custodial interrogation."). Here, on the airplane the police asked no questions and only responded to Mickey's desire for small talk. They engaged in casual conversation of the type generally not subject to *Edwards*.

**[8]** Mickey argues that the small talk, though casual, does not fall under this general rule. In his view, Landry had reason to know his behavior might elicit an incriminating response because he was "softening up" Mickey by participating in a discussion of the connections between their two families, including Landry's knowledge of Mickey's brother's suicide. But, Landry did not intend and had no reason to know that his statements about his various family members and how they interacted with Mickey's family were likely to elicit an incriminating response in the context of a conversation ranging from California, philosophy, and politics to family, food, and football. *See United States v. Hackley*, 636 F.2d 493, 498 (D.C. Cir. 1980) (holding that a statement from a conversation about defendant's cousin in which police mentioned their inability to reach her after her arrest was not interrogatory). Here, the small talk was not interrogational. Moreover, *Mickey* initiated the discussion of California connections between the two men. His words and deeds thus can be "fairly said to represent a desire" to "open up a more generalized discussion relating . . . indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983). Since Mickey was not interrogated and, in any event, initiated the discussion on

the airplane, his *Miranda* and *Edwards* rights were not violated on the flight.

**[9]** Similar reasoning applies to the Hawaii statements. Mickey initiated the conversation with Landry that led to the statements in the Hawaii jail while disembarking from the airplane, by saying: "I would like to continue our conversation at a later time." This statement is more of an initiation than that of the defendant in *Bradshaw* itself, where the defendant merely asked "Well, what is going to happen to me now?" 462 U.S. at 1045. At the Hawaii jail, furthermore, Mickey was re-*Mirandized* and waived his rights in writing. Mickey argues this waiver was involuntary. But the same standard of voluntariness in due process claims also applies to *Miranda* waiver claims. *Connelly*, 479 U.S. at 169-70. Accordingly, Mickey's waiver was not involuntary for the reasons discussed in Part II.A. We are satisfied that Mickey's *Miranda* rights were not violated during the flight and in Hawaii.

## III

Mickey next argues that he received ineffective assistance of counsel at the guilt phase of his trial.[3] A defendant's Sixth Amendment rights are violated if counsel's representation "fell below an objective standard of reasonableness" and such deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). There is a strong presumption of competence because of the bias of hindsight. *Bell v. Cone*, 535 U.S. 685, 702 (2002). Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. A "reason-

---

[3]As noted in footnote 1, Mickey was represented by two attorneys, Tuttle and Shattuck. We consider their combined performance because the record does not indicate that their representation was not joint. The word "counsel" refers to both attorneys' joint representation.

able probability" is that which is "sufficient to undermine confidence in the outcome." *Id.*[4]

A

Under California law at the time of Mickey's offense, defendants could argue that they lacked the capacity to deliberate or to premeditate that was required for first degree, or death-penalty eligible, murder. *People v. Mosher*, 1 Cal. 3d 379 (1969); *see* Cal. Penal Code § 25(a) (abolishing diminished capacity defense for crimes committed after 1982). Mickey argues that his counsel were deficient for failing to investigate and present such a mental health defense. In particular, he contends that counsel failed to call examining psychiatrist Dr. David Axelrad, failed adequately to investigate a diminished capacity defense, and presented an unbelievable self-defense theory. In Mickey's view, this deficiency prejudiced him by conceding an element of the offense, his capacity to deliberate. We disagree.

As an initial matter, we distinguish between two duties the parties conflate. On the one hand, counsel must investigate relevant defenses. *Strickland*, 466 U.S. at 690-91; *Rios v. Rocha*, 299 F.3d 796, 799 (9th Cir. 2002). On the other hand, counsel must reasonably select and present a defense. *Strickland*, 466 U.S. at 690-91; *Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001). These are different duties. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (contrasting "whether counsel should have presented a mitigation case" with "whether the investigation support[ed] counsel's decision not to introduce mitigating evidence . . . was *itself* reasonable") (emphasis modified); *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2004). It is true that evaluation of the two duties

---

[4]As discussed in Part II, we review Mickey's claims under pre-AEDPA standards. We review the district court's ruling on ineffective assistance of counsel de novo. *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995).

overlaps: counsel will be hard pressed to satisfy the duty to select a defense when counsel fails to investigate the best defense. *E.g.*, *Phillips*, 267 F.3d at 980. But counsel may fail to investigate a particular defense and still, luckily, present the best one. He may also properly investigate various defenses, but unreasonably select among the alternatives. The inquiries also overlap at the prejudice stage: with respect to defective investigations, the test for prejudice is whether the noninvestigated evidence was powerful enough to establish a probability that a reasonable attorney would decide to present it and a probability that such presentation might undermine the jury verdict. *Wiggins*, 539 U.S. at 535.

1

**[10]** Guided by this distinction, we first consider counsel's performance of their "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. An investigation must be more than cursory. *Rios*, 299 F.3d at 805-06 (holding that counsel must interview more than one witness before abandoning a particular defense). For mental health defenses, counsel cannot ignore "abundant signs" of mental illness, *Seidel v. Merkle*, 146 F.3d 750, 755 (9th Cir. 1998), or rest on a "preliminary examination," *Daniels v. Woodford*, 428 F.3d 1181, 1203-04 (9th Cir. 2005). At the same time, of course, counsel need not investigate interminably. *Hendricks v. Calderon*, 70 F.3d 1032, 1037 (9th Cir. 1995).

**[11]** Here, Mickey's counsel conducted a significant investigation into a mental health defense. Counsel employed no fewer than four mental health experts for the guilt phase. Dr. Frederick Whipple, a forensic psychiatrist, evaluated Mickey on March 23, 1981, only two months after Mickey's extradition to the United States and over two years before the start of his trial. In July 1981, still nearly eighteen months before trial, counsel hired another psychiatrist, Dr. A. David Axelrad, who examined Mickey several times over the course of

three months. Axelrad, in turn, hired two clinical psychologists, Grant L. Hutchinson and Thomas L. Morrison, to assist in evaluating Mickey. Hutchinson evaluated Mickey on September 21, 1981. Morrison also administered psychological testing to assist Axelrad. This investigation was sufficient. *See Hendricks*, 70 F.3d at 1037 (holding that hiring of only two mental health experts was not deficient).

Even if there were deficiencies in that investigation, they are justified by a "reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see Wood v. Allen*, 130 S. C.t 841, 850-51 (2010) (holding that state court's factual finding that counsel made a strategic decision not to investigate further a mental illness that, if reasonable, would make counsel's investigation not deficient, was reasonable under AEDPA review). *Turk v. White*, 116 F.3d 1264 (9th Cir. 1997), is instructive as an application of this principle. In that case, counsel chose a self-defense theory instead of a mental health defense theory because the former was the "strongest defense." *Id.* at 1266. In particular, a mental health defense "would have been inconsistent with a defense based upon the facts as presented by both [the defendant] and as contained within the officers' reports" because the self-defense theory "required [defendant] to prove that he acted reasonably, while the insanity defense required [defendant] to prove that he did not understand what he was doing." *Id.* (internal quotation marks omitted). We held that counsel acted reasonably in relying on the defendant's communications and police reports in light of this conflict. *Id.* We also held that this reasonable strategy justified counsel's decision not to investigate further a mental health defense. *Id.* at 1267.

**[12]** The same is true here: any deficiencies are justified by the reasonable strategic decision to investigate a defense consistent with Mickey's extrajudicial statements. After counsel lost motions to exclude Mickey's statements on the airplane to Hawaii, in the Hawaii jail, and to a jailhouse informant, he was faced with a situation in which the jury would hear

incriminating admissions in the defendant's own words, qualified only by self-defense rhetoric. But, just as in *Turk*, here a mental health defense would require counsel to prove that the defendant could not act reasonably, while his assertions of self-defense assumed he could. Faced with this evidence, it was reasonable for counsel not to investigate a conflicting mental health defense beyond the four experts he consulted.

2

**[13]** Nor were counsel deficient in failing to present a mental health defense. Counsel need not present a defense just because it was viable. In *Hendricks*, for example, we blessed counsel's decision to forego a mental health defense because it was not entirely persuasive, was subject to serious cross-examination, and would expose the jury to the defendant's other crimes. 70 F.3d at 1037. The Supreme Court recently affirmed this type of reasoning in *Wong v. Belmontes*, 130 S. Ct. 383 (2009), where it strongly suggested that counsel's decision to forego a defense because it would prompt the introduction of damaging evidence was not deficient. *Id.* at 385-86.

**[14]** Here, there were numerous reasons justifying counsel's decision not to present a mental health defense and instead to rely on reasonable doubt and argue a self-defense theory. First, a mental health defense was unlikely to persuade a jury. *Williams v. Woodford*, 384 F.3d 567, 610-11 (9th Cir. 2004) (holding counsel need not put on an unpersuasive defense). A mental health defense would have presented evidence that Mickey lacked the capacity to premeditate or deliberate about the killings. But Mickey flew from a foreign country to commit the murders, planned a rendez-vous with his accomplice, did not kill the pair the first time he visited them for fear of getting caught, wiped down the car he drove to eliminate fingerprints, and assembled and brought weapons to the crime scene. In light of the established facts of the crime, it was reasonable for counsel to believe that a jury

would likely be skeptical of an argument that Mickey lacked the ability to deliberate and plan. Furthermore, the mental health defense based on delusions about Hanson would not explain Mickey's murder of Blount, who slept in a different room than Hanson and, according to Mickey's own experts, was not a part of Mickey's delusional scheme. Finally, this mental health defense conflicted with Mickey's own statements. Mickey claimed self-defense during interviews in which the police described him as alert and cognitively stable. But if he was in a delusional state at the time of the murders, how could he be defending himself? Counsel were not deficient in deciding not to portray his client as a flip-flopper. *See Turk*, 116 F.3d at 1266-67.

Second, a mental health defense was likely to open the door to evidence of Mickey's deviant sexual behaviors. *Belmontes*, 130 S. Ct. at 385-86 (commenting on superior performance of counsel in excluding damaging evidence while presenting a defense); *Hendricks*, 70 F.3d at 1037 (holding counsel acted reasonably when not exposing the jury to the defendant's other crimes). The experts who would have testified to Mickey's alleged mental health defense and its effect on him based their diagnosis on his sexualized relationship with his mother. This reliance, in turn, would have opened the door to issues of Mickey's sexual exhibitionism and his two and a half year sexual abuse of his step-daughter starting when she was eight years old. It is no overstatement to say that a jury would not look favorably upon a defendant with a pattern of sexual misbehavior that had recently escalated into years-long sexual abuse of his own step-daughter. Counsel successfully excluded this evidence from the penalty phase, and reasonably took steps to avoid opening the door to it here.

Third, counsel reasonably took into account the climate of the times. Mickey was tried at a time of hostility to mental health defenses. Although such defenses were available to Mickey, California had recently abolished them prospectively by plebiscite. Cal. Penal Code § 25(a). They had also voted

merely five years earlier to expand the death penalty pursuant to the Briggs Initiative, and outrage existed over the diminished capacity defense of the killer of the San Francisco mayor George Moscone and supervisor Harvey Milk. The people also were soon to vote out three California Supreme Court justices for their perceived efforts to frustrate the death penalty. Robert Lindsey, *Deukmejian and Cranston Win As 3 Judges Are Ousted*, New York Times, Nov. 6, 1986, at A30.

3

Mickey responds with two reasons why counsel's decisions regarding a mental health defense cannot be justified on the grounds that a mental health defense was inconsistent with the self-defense theory. Mickey first argues that a mental health defense is not inconsistent with his self-defense rhetoric in his Hawaii statements because his schizophrenia, diagnosed after trial, explains the statements as the product of disease. At the time of trial, however, none of the four guilt-phase experts or the two penalty-phase experts even raised as a possibility, let alone concluded, that Mickey had schizophrenia. In fact, three of the four experts found no evidence of psychological abnormality. Even the penalty-phase expert Dr. Burstein, testifying in habeas proceedings with the advantage of twenty years of hindsight, could only suggest that he may have reached a diagnosis of schizophrenia with certain other information, and the district court found his testimony incredible.

[15] Mickey next argues that the introduction of mental health evidence in the penalty phase undermines any claim of inconsistency to justify counsel's decisions. But there is no requirement of consistency between the two phases. *Hendricks*, 70 F.3d at 1041. Furthermore, Mickey misunderstands the purpose of the evidence in the two phases. In the guilt phase, mental health evidence would explain why Mickey was not guilty because he lacked capacity. In the penalty phase, mental health evidence would explain why, though he had capacity, he was less culpable. It is reasonable to think

that the same evidence might be useless for the former but helpful for the latter given the facts of the crime. In other words, it was reasonable for counsel to save their best argument against the death penalty—mental health—for the phase in which it would be most effective. Thus, counsel were not deficient in the investigation and presentation of a mental health defense.

B

In any event, the Supreme Court's recent cases dictate that any deficiency in representation was not prejudicial because it is not "sufficient to undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. In *Belmontes*, for example, the Court emphasized that the difference between what the petitioner wanted counsel to present and what he presented was marginal, that the new evidence the petitioner wanted presented opened the door to harmful evidence, and that the facts of the crime matter. 130 S. Ct. at 386-90. In *Porter v. McCollum*, 130 S. Ct. 447, 454 (2009), the Court similarly emphasized the great effect on the prejudice determination of the large difference between the evidence counsel presented and should have presented. Even though both cases were penalty-phase cases, they could not be clearer in their instruction: whether prejudice results matters.

Here, any deficiency in counsel's performance does not create a "reasonable probability" that the "result of the proceeding would have been different," such that we lack confidence in the outcome of the trial, *Strickland*, 466 U.S. at 694, because the evidence of Mickey's guilt for premeditated murder was overwhelming. *Belmontes*, 130 S. Ct. at 390 (finding no prejudice primarily because the evidence in favor of the death penalty was "simply overwhelming"). Mickey visited Hanson prepared to commit the crime once before he did so, assembled and brought weapons to Hanson's home twice, enlisted an accomplice from whom to obtain weapons and transportation and with whom to split the proceeds, set up a

rendez-vous with that accomplice, and wiped his fingerprints off of the getaway vehicle.

Moreover, Mickey's response to all of this evidence—that he spontaneously acted in self-defense—sharply conflicted with the physical evidence and his pre-trial statements. The physical evidence showed that Hanson's throat was slashed from ear to ear down to the spinal cord and Blount was stabbed seven times in the chest so hard three of the blows pierced her heart. Yet Mickey maintained both to police on the way back from Japan and to a jailhouse informant before trial in California that he acted in self-defense.

**[16]** Additionally, there was ample other evidence of Mickey's premeditation and deliberation. His accomplice, Rogers, testified that Mickey traveled from Japan intending to kill Hanson. Mickey's own letters to his wife, furthermore, also showed that he traveled to California to alleviate his family's financial problems by killing Hanson. Given this substantial evidence of premeditation, we do not think there is a "reasonable probability" that the results of the guilt phase of the trial would have been different, such that we lack confidence in the trial's outcome, if counsel had deployed a mental health defense to contest Mickey's capacity to deliberate. Therefore, we conclude that Mickey's constitutional right to effective assistance of counsel was not violated in the guilt phase of his trial.

IV

In its cross-appeal of the district court's grant of the habeas petition regarding the penalty phase of Mickey's trial, the State contends that the district court erroneously held that Mickey was denied effective assistance of counsel. Mickey had argued before the district court that counsel ineffectively investigated and failed to present a mitigation case that Mickey suffered a harmful childhood. He also argued that counsel ineffectively utilized the penalty-phase experts and

failed to provide them with adequate information. The district court accepted Mickey's arguments and ruled that these errors prejudiced Mickey.

A

The State first argues that counsel did not perform deficiently with respect to investigating adequately and presenting evidence of childhood abuse and mental health issues. The State also argues that, in any event, Mickey did not suffer prejudice from any deficiency. We agree with the State on both points.

1

We first consider counsel's investigation of abuse in Mickey's childhood. Mickey first argues counsel's preparation was too late and too little. We are guided by the Supreme Court's recent decision in *Bobby v. Van Hook*, 130 S. Ct. 13, 17-20 (2009). In that case, the Court held that the timeliness and scope of counsel's investigation was reasonable. *Id*. at 17-18. Van Hook first claimed, as does Mickey, that counsel began its investigation of mitigating evidence and preparation for the penalty phase too late. *Id*. at 18. The Court held otherwise, on the grounds that counsel was in touch with penalty-phase witnesses the entire *three months* between indictment and trial, was in touch with an expert "*more than a month* before trial," sought records *seven weeks* before trial, and "*looked into*" hiring a mitigation specialist *five weeks* before trial. *Id.* (emphases added).

**[17]** When we compare *Van Hook* to this case, we are persuaded that Mickey's counsel timely prepared. Counsel hired an investigator in February, 1981, immediately after appointment by the court. That investigator accompanied counsel to Japan and interviewed the defendant's then-current wife at that time. The investigator also hired three individuals to assist him on the case. In July 1981, still eighteen months

before trial, counsel hired Dr. Axelrad to psychologically evaluate Mickey, as a supplement to forensic psychiatrist Dr. Whipple's evaluation and report in March 1981. Axelrad in turn hired two clinical psychologists, Hutchinson and Morrison, to assist in evaluating Mickey. Hutchinson evaluated Mickey on September 21, 1981, and Morrison also administered psychological testing to assist Axelrad. Additionally, in January 1983, over five months before the guilt phase and seven months before the penalty phase, counsel hired the National Jury Project, a jury selection consultant. The first meeting took place on March 18, 1983, five months before the penalty phase. Soon after that, in April 1983, counsel hired a social worker intern to prepare a social history. She completed her report well before the penalty phase began. Her report summarized Mickey's life, based primarily on reports by Mickey because of the division of labor between social historian and investigator established by counsel. Finally, in May 1983, counsel hired two experts solely for the penalty phase, Smith, and Burstein. These experts provided extensive testimony regarding Mickey's life and mental state during the penalty phase. In light of the timeline of this investigation and the much shorter investigation in *Van Hook*, we cannot hold that counsel did not timely investigate Mickey's childhood.

Mickey also claims, as Van Hook did, that his counsel did not conduct a sufficiently broad investigation of his childhood. *Van Hook*, 130 S. Ct. at 18-19. The Court in *Van Hook* disagreed with the petitioner, calling this a "gross distortion." *Id.* at 18. Counsel, the Court recounted, conducted several interviews with *four* individuals—Van Hook's mother and father, a caregiving aunt, and a family friend Van Hook visited after the crime—and learned all about Van Hook's childhood, including his drinking as a toddler, his parents' alcoholism, his father's domestic abuse, and his mental health issues. Counsel, therefore, did not need to "interview other family members—his step-sister, two uncles, and two aunts—as well as a psychiatrist who once treated his mother" because "there comes a point at which evidence from more distant rel-

atives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.* at 19. It "was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents." *Id.*; *see Cox v. Ayers*, 588 F.3d 1038, 1046, 1048-49 (9th Cir. 2009) (holding that counsel who interviewed nine individuals conducted sufficient investigation); *Williams*, 384 F.3d at 613-14 (holding that counsel who investigated family and life history, drug use, and mental state of defendant, "interviewed a number of witnesses suggested by [the defendant]," obtained various records, and compiled a client history conducted an adequate investigation); *Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (holding investigation was not deficient in part because "[c]ounsel hired an experienced death penalty investigator who conducted a thorough investigation into [defendant's] history").

**[18]** Similarly, counsel's investigation here was sufficiently broad. Counsel hired an investigator who interviewed over forty potential witnesses, thirty of whom testified in the penalty phase, spanning Mickey's life, in an investigation that took him or counsel to Japan, Hawaii, Alabama, Nevada, Washington, Oregon, Alaska, and Louisiana. Counsel learned about Mickey's childhood, including his relationship with his mother, his half-brother's death, his mother's death, his positive reputation with his peers and teachers, his productive school life, and his descent into the drug culture. The investigation also covered Mickey's adult life, including his career, his relationship with his wife, ex-wives, and step-children, and his relationship with Hanson. As in *Van Hook*, it was not unreasonable for counsel to go only as far as they did, stopping after interviewing forty witnesses. This is especially true because the forty witnesses, without exception, stated and then testified that Mickey enjoyed a fairly good childhood. None testified to abuse.

**[19]** Mickey argues, however, that despite this breadth, counsel's investigation was deficient because it failed to

uncover evidence of psychiatric illness prior to his drug abuse and because it failed to uncover physical, emotional, and sexual abuse in Mickey's childhood. For support Mickey points to a new social history of his life completed in 1996. We are not persuaded that this new social history changes the analysis.

[20] First of all, the new social history does not establish that Mickey had psychological problems *before* his drug use. It reported that Mickey engaged in a "*16*-year period of virtually uninterrupted drug and alcohol abuse, beginning in *1964*, and accelerating after the death of his mother in 1966." This substance abuse, the report continued, "seems to have had an exacerbating effect on the grandiose and persecutory beliefs that Doug began to develop during the *mid-1970s*." Thus, Mickey is simply incorrect that there was undiscovered evidence of pre-drug abuse psychiatric disturbance for counsel to investigate.

The same is true of the new social history with respect to the purported abuse. It is black-letter law that counsel cannot be found deficient for believing what his client plausibly tells him: "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691; *Cox*, 588 F.3d at 1048-49 (holding counsel not responsible for defendant's failure to mention abuse); *Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006).

But, both the 1983 social history's finding of no abuse and the new 1996 social history's findings of rampant abuse and family problems are based on Mickey's self-reporting. The 1983 social history was based solely on interviews with Mickey. In it, Mickey described his childhood as "peaceful," saw his father as "quiet, gentle and a little distant," claimed that his parents "never fought with each other," and described only "fanciful" sexual thoughts about his mother, in addition

to a pattern of sexual exhibitionism. Mickey portrayed no abuse and no incest. The new social historian's interview with Mickey apparently yielded different results, according to the paragraphs in the new social history that are attributed solely to Mickey. Mickey now recalls "many beatings" of his brother, that his dad was "nuts and swinging away and Mom was supporting him all the way," that he was himself "repeatedly victimized" by his father, that his mother would "remark on [his] aroused state" when they touched, that she "masturbated him manually" on at least one occasion, and that his parents repeatedly destroyed or forced him to destroy family pets.

**[21]** To be sure, the new social history does not rely solely on Mickey. But few of the other declarations on which it relies are cited for the new abuse and incest Mickey now documents, and the cited declarations do not appear to support the new findings. For example, the declarations of family friends Fleming and Kimbrough, used to support many of the new findings of abuse and incest, are relatively mild, demonstrating only that Mickey loved his dog and then it died and that Mickey's mother inappropriately showed a neighbor the pre-adolescent Mickey's medical problem involving undescended testicles. These declarations hardly support a conclusion that Mickey was forced to kill his dog or that Mickey was sexually abused. Similarly, the declarations by other family members that purportedly demonstrate that Mickey's father was an alcoholic, or the declarations by neighbors that claim that Mickey's mother was "oversexed," are too vague to support Mickey's new allegations of abuse and incest. The new report thus amounts to a change in story. We refuse to find counsel deficient for not uncovering evidence that Mickey did not tell the original investigators, especially when forty witnesses confirmed Mickey's original story.

Since counsel were not deficient in their investigation into abuse, they also were not deficient in failing to present evidence of the same abuse. But, even if counsel were deficient

in uncovering this purported abuse, the testimony of the forty witnesses provides an additional reason that counsel were not deficient in not presenting it. If counsel presented Mickey's new story regarding abuse, assuming Mickey or someone else would have testified to it, then surely the State could have put on some of the forty witnesses to contradict Mickey or the other witness. *Williams*, 384 F.3d at 611 (holding counsel may refuse to call witnesses because of their weakness on cross-examination).

Moreover, counsel reasonably chose not to present evidence of abuse because such evidence would have opened the door to prosecution rebuttal evidence showing Mickey's sexual deviancy, including the molestation of his step-daughter. Counsel need not present evidence that may do more harm than good. In *Williams*, for example, we held that counsel need not have presented evidence concerning the defendant's "family and life history, drug use, and mental state" because such would open the door to evidence concerning the defendant's significant gang activity. 384 F.3d at 613-15; *see Belmontes*, 130 S. Ct. at 385-86 (strongly suggesting that counsel did not deficiently perform by presenting meager mitigation case because presentation of more mitigation evidence would open the door to rebuttal evidence); *Cox*, 558 F.3d at 1051-52 (upholding counsel's strategic choice to present a mitigation defense other than childhood abuse).

**[22]** In this case, if counsel had attempted to introduce childhood abuse evidence, the prosecution most likely would have responded by introducing rebuttal evidence of Mickey's sexual deviancy, including years-long sexual abuse of his step-daughter. Starting in his late teenage years and running through the time of the crime, Mickey had exhibited himself in public. This pattern escalated into a two and a half year sexual abuse of his step-daughter. From the case's inception, counsel successfully strove to exclude this evidence of Mickey's sexual deviancy. But introduction of the purportedly since-discovered evidence regarding Mickey's childhood

would have opened the door to this harmful evidence, just like introduction of a mental health defense in the guilt phase would have opened the door to similar harmful evidence, *see supra* Part II, at 8108. The experts who would have testified to Mickey's alleged childhood abuse and its effect on him could not help but mention his newly discovered sexual relationship with his mother, which one of them calls "the single most damaging and shaping fact of Doug's life." And that discussion, of course, would raise the issue of Mickey's teenage exhibitionism, and then his adult exhibitionism, and then his molestation of his step-daughter. An expert who testified to the sexual abuse and its effect on Mickey would be subject to cross-examination on the molestation. Cal. Evid. Code 721(a). Counsel surmised, reasonably, that the penalty phase jury might not look kindly upon evidence that the defendant routinely exhibited himself in public and sexually abused his step-daughter.

2

The State also argues that Mickey did not suffer prejudice from any deficiencies he claims. In its view, even if counsel should have presented Mickey as an abused and mentally ill individual before his mother's death and his descent into drug use, instead of as a good child who started drifting into drugs after his mother's death, such a choice does not "undermine[ ] confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694. We agree.

Even if Mickey's claims regarding deficiency had merit, the Supreme Court's recent cases indicate that Mickey cannot show prejudice. *Belmontes*, 130 S. Ct. at 383; *Van Hook*, 130 S. Ct. at 19. In *Belmontes*, the Court accepted, without deciding, that counsel should have presented more mitigating evidence. But it held that Belmontes did not suffer prejudice in any event, disagreeing with our holding that the aggravation evidence was "scant" and would have been outweighed by more mitigating evidence. *Id*. at 390. The Supreme Court first

reaffirmed that the prejudice inquiry is holistic and so must "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued the different path." *Id*. at 386. In *Belmontes*, if counsel had introduced more mitigation evidence, the door would have been opened for the prosecution to introduce Belmontes' boasts regarding his ganglandstyle murder of another individual several years before his most recent murder. *Id*. at 385. That, the Supreme Court, held, was the "elephant in the courtroom" in the prejudice determination. *Id.* at 390. The aggravation evidence thus could not be considered "scant." *Id*.

This case is strikingly similar to *Belmontes* in this respect. Even if counsel were deficient in not uncovering and introducing the new, abused version of Mickey's childhood, Mickey did not suffer prejudice because the prosecution would have introduced rebuttal evidence of Mickey's sexual deviancy, including sexual abuse of his step-daughter, as discussed above. It is no overstatement to say that a jury would not look favorably upon a defendant with a pattern of sexual misbehavior that had recently escalated into sexual abuse of his own step-daughter. This sexual deviancy is this case's "elephant in the courtroom," and makes it so that any deficiency does not create a "reasonable probability" of a different outcome. *Strickland*, 466 U.S. at 694.

Moreover, the Supreme Court in *Belmontes* and *Van Hook* reaffirmed that the facts of the crime play an important role in the prejudice inquiry. *Belmontes*, 130 S. Ct. at 390-91. In *Belmontes*, the Court emphasized that Belmontes "was convicted on extremely strong evidence that he committed an intentional murder of extraordinary brutality." *Id*. The aggravating evidence, "in particular, the circumstances of the crimes—was simply overwhelming." *Id.* The jury viewed numerous autopsy photographs showing the 15 to 20 blows from a steel dumbbell upon the victim and heard evidence that Belmontes committed the crime solely to steal $100. *Id*.

In *Van Hook*, the Court similarly held that, even if counsel performed deficiently, Van Hook suffered no prejudice in part because of the facts of the crime. *Van Hook*, 130 S. Ct. at 19-20. In particular, the Court stressed that Van Hook committed the murder alone in an aggravated robbery with premeditation, escalating a pattern of robberies of gay men to the killing and disfiguring of his victim in this case. *Id.* at 19. Such facts of the crime, the Court held, outweighed by themselves the sum of the mitigating evidence Van Hook wanted counsel to present. *Id.*

The jury in this case, like the jury in *Belmontes* and *Van Hook*, was confronted by a particularly violent crime. The evidence demonstrated that Mickey, like Belmontes, committed a double murder in order to steal a small amount of property. And, as in *Van Hook*, the jury heard evidence that Mickey committed this crime intentionally, planning it out carefully by flying from Japan, enlisting an accomplice to procure weapons and transportation, and calling off his first attempt for fear of capture. Additionally, as in *Belmontes*, the jury saw ten pictures that chronicled the positions of the bodies of Hanson, whose throat was slashed to the spinal cord from ear to ear, and Blount, who was stabbed seven times in the chest so hard three of the blows penetrated her heart.

**[23]** The State's near-exclusive reliance on the facts of the crime at the penalty phase strengthens our conclusion that there is not a "reasonable probability" that the outcome would have been different had Mickey presented a different mitigation case. *Strickland*, 466 U.S. at 694. During the penalty phase, the prosecution presented only four witnesses, who testified to domestic abuse by Mickey. 54 Cal. 3d at 639. The defense, by contrast, put on thirty lay witnesses and two experts who testified as to Mickey's positive characteristics and his mental defects. *Id.* at 640. The testimony covered all aspects of Mickey's life, ranging from the tragedy he experienced at five years of age when his half-brother died, the deep loss he felt when his mother died in a potential suicide when

he was 17 years old, his decline into drug use, his ability to adapt well to life in prison, and his mental state on the night of the murders. This disparity indicates that the jury sentenced Mickey to death almost exclusively on the facts of the crime, despite what the California Supreme Court called a "substantial" penalty-phase presentation by the defense. *Id.* at 639. Since the harmful sexual deviancy evidence would have been admitted in the penalty phase had counsel taken Mickey's proposed path and since the jury must have relied heavily on the gruesome facts of the crime despite the "substantial" mitigation case, our "confidence in the outcome" is not undermined by Mickey's counsel's alleged deficiencies, *Strickland*, 466 U.S. at 694, and we are persuaded there was no prejudice.

## B

### 1

**[24]** The State also argues that counsel's interaction with the penalty-phase mental health experts was not deficient. We agree. Counsel put on two mental health experts in the penalty phase. Smith, a toxicologist, testified that Mickey suffered from toxic psychosis, a self-induced drug disorder stemming from Mickey's poly-drug substance abuse. Burstein, a psychiatrist, testified that Mickey was delusional at the time of the crime, plagued by a borderline personality disorder exacerbated by his use of multiple types of drugs. These experts provided substantial testimony before the penalty phase jury.

Mickey, however, points to three deficiencies. First, he argues that counsel should have better coordinated the experts' testimony. The experts, for example, differed as to whether Mickey needed to be intoxicated for a diagnosis of toxic psychosis. But surely counsel cannot be faulted for the fact that their experts gave inconsistent sworn testimony. We do not expect counsel to manipulate experts to get their stories straight, Mod. R. Prof. Conduct 3.3, so it is not deficient for them to refrain from doing so.

Mickey also argues that counsel should have deployed the penalty phase experts in surrebuttal of the prosecution's expert. But such testimony might not even have been allowed by the trial judge. *People v. Lamb*, 40 Cal. Rptr. 3d 609, 614 (Cal. Ct. App. 2006). And it is not deficient to refuse to join a battle royale of experts. *Hendricks*, 70 F.3d at 1037 *(citing Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("[E]ven where there is a strong basis for a mental defense . . . an attorney may forego that defense where the attorney's experts would be subject to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion."); *see Williams v Woodford*, 384 F.3d 567 (9th Cir. 2004) (holding that counsel may refuse to call experts because of their weakness on cross-examination). It was reasonable for counsel to conclude that surrebuttal was unlikely to strongly influence the jury.

Mickey next argues that counsel were deficient in the communication of medical-related information and the facts of the crime to the experts Burstein and Smith. This, too, is unavailing. With respect to Burstein, Mickey claims that counsel were deficient in providing a garbled tape of the Hawaii interview with police. But, Burstein notably does not claim he ever requested a better version or a transcript. Mickey also claims that counsel should have provided access to the testimony of the accomplice Rogers and Mickey's ex-wife Rochelle for corroboration of Mickey's history of drug use. But Mickey's drug use was not in dispute. Conveying such additional information was therefore unnecessary. *Hovey v. Ayers*, 458 F.3d 892, 925-26 (9th Cir. 2006) (holding counsel must bring *relevant* facts to attention of experts). We decline to rule that counsel must provide, unsolicited, access to fact witnesses. *Id.* (holding counsel must only provide relevant *facts* of the crime).

Finally, Mickey claims that counsel should have provided a Minnesota Multiphasic Personality Inventory ("MMPI"), given in 1981, and naval discharge records to Burstein. But

these are not the type of public or readily available evidence counsel must obtain, and then provide to experts. *Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005) (holding counsel must examine public information, like prior conviction records, prosecutor is likely to use); *see Raley*, 470 F.3d at 801 (ruling sufficient counsel's provision of "basic background information" on defendant to experts). In any event, "reasonable professional judgments [can] support[ ] limitations on investigation." *Strickland*, 466 U.S. at 690-91. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (observing that counsel may render ineffective assistance "where he neither conducted a reasonable investigation *nor made a showing of strategic reasons for failing to do so*" (emphasis added)). Here, there was such a judgment. Counsel knew that Burstein administered his own MMPI. It is not until now that Burstein claims that a change between the two MMPIs might have been significant, testimony the district court found incredible.

With respect to the second penalty-phase expert, Smith, Mickey claims that counsel should have provided access to the Hawaii interview tape, Rogers' testimony, Mickey's 1980-81 letters to his wife, the navy discharge records, the ex-wife Rochelle, a gourd and necklace of Mickey's, and family history information. As an initial matter, it is not deficient performance to fail to provide information beyond an expert's expertise because an expert cannot testify beyond his expertise. Cal. Evid. Code § 720(a); *see Korsak v. Atlas Hotels, Inc.*, 3 Cal. Rptr. 2d 833, 837 (Cal. Ct. App. 1992). Smith is a toxicologist, studying drug-related disorders. The Hawaii interview, in which a sober Mickey allegedly hallucinates, is thus of little use to him. Furthermore, Mickey's long-term drug use was not in dispute. Thus, access to Mickey's 1980-81 letters, ex-wife Rochelle, the navy discharge records, and Rogers' testimony, all of which primarily established that Mickey was a long-term drug user, was unnecessary. Mickey is also incorrect about the gourd and necklace—both were available for trial, if only Smith asked. Finally, at the time of the trial, Smith's research on the genetic links of certain dis-

eases was in the nascent stages, so it was not deficient to fail to provide him with Mickey's family history.

2

Even assuming counsel's interaction with the penalty phase experts was deficient, *Van Hook* and *Belmontes* again compel the conclusion that prejudice did not result. In both cases, the Court reasoned that the omission of cumulative evidence and minor additional details from the penalty phase did not prejudice the defendant. *Belmontes*, 130 S. Ct. at 387; *Van Hook*, 130 S. Ct. at 19. The same is true here: correcting the deficiencies Mickey criticizes does not create a "reasonable probability" of a different result. *Strickland*, 466 U.S. at 694.

The lack of prejudice with respect to the first two alleged deficiencies is particularly clear. Mickey did not suffer prejudice from an alleged deficiency in coordinating the experts' testimony with respect to whether Mickey needed to be intoxicated for a diagnosis of toxic psychosis because there is no evidence that more coordination would eliminate this inconsistency. The deficiency thus does not create a reasonable probability of a different outcome.

Nor did Mickey suffer prejudice from counsel's failure to employ the two penalty-phase experts to surrebut the prosecution's rebuttal expert. Even assuming that the trial court judge would allow such surrebuttal, it is widely accepted that the absence of marginal and cumulative evidence is not prejudicial. *Belmontes*, 130 S. Ct. at 386-90; *Van Hook*, 130 S. Ct. at 19. Here, Mickey's experts on surrebuttal would merely have added a few additional details to their testimony, again explaining why they were right and the prosecution expert wrong. In particular, the experts would have clarified why their diagnoses of toxic psychosis with borderline personality disorder disease was superior to the prosecution's diagnosis of a slightly different disease (atypical personality disorder) and why their focus on particular pieces of evidence was justified.

Such marginal, cumulative comments do not create a "reasonable probability" of altering the jury's calculus. It is not per se prejudice to not get the last word.

Finally, Mickey did not suffer prejudice because counsel could have better prepared the experts Burstein and Smith with respect to medical materials and basic facts of the crime. As for the medical materials, Burstein testified during his deposition that the new medical information, a MMPI from 1981, would not change his testimony on the ultimate question of Mickey's diagnosis. While he qualified that testimony somewhat during the district court hearing, he ultimately stood by his original diagnosis and the district court discredited his speculation as to the importance of the MMPI, calling him a partial "advocate." Similarly, Smith did not even claim that the new information would alter his testimony.

Nor would the new medical information radically buttress the experts' testimony, causing it to shift from mere "artifice" to gamechanging revelation that creates a reasonably probability of a different outcome. *Bean v. Calderon*, 163 F.3d 1073, 1081-82 (9th Cir. 1998). Burstein's testimony, on Burstein's own view, would have been additionally supported only by hearsay statements from Mickey's ex-wife regarding delusions. But such hearsay is of little value, especially since Mickey's ex-wife did not distinguish between drug-induced and non-drug-induced delusions. The same is true for Smith's testimony, which would only have been bolstered by additional evidence of Mickey's uncontested drug use and family history, the latter of which was unhelpful given the state of genetic research at the time of the trial.

Nor was Mickey prejudiced by counsel's alleged deficient performance in preparing Burstein and Smith regarding the basic facts of the crime. It is true that the prosecutor confronted Burstein with the inconsistency of his mental health theory, based on Mickey's self-reporting, and Mickey's premeditation and planning. But Burstein responded that such

planning was consistent with his diagnosis. Thus, Burstein's testimony would not have been significantly improved by more information about the crime. Rather, it suffered from a fundamental weakness that could not be remedied, that is, that a jury was unlikely to believe that a defendant suffering as Burstein diagnosed could act as the facts of the crime showed that Mickey did. Mickey's claim that these additional, minor improvements to Burstein's testimony create a "reasonable probability" of swaying the jury is, as the Court described a similar interpretation of the facts in *Belmontes*, "fanciful." 130 S. Ct. at 391.

**[25]** The contrast between this case and *Porter*, where the Court did find prejudice for failure of counsel to deploy adequately mental health experts, confirms our assessment. 130 S. Ct. at 454. In that case, the Court emphasized that counsel presented no evidence at all concerning Porter's mental health sufferings with respect to his service in the Korean war and brain abnormalities. *Id.* at 454-55. Here, by contrast, counsel presented extensive expert testimony. Overall, even assuming Mickey is right that counsel were deficient in a few respects regarding the expert testimony, this case is a far cry from those in which counsel's interaction with experts prejudiced the defendant. Our confidence in the state court outcome is far from undermined. *Strickland*, 466 U.S. at 694. Mickey's constitutional right to effective assistance of counsel was not violated in the penalty phase of his trial.

V

For the foregoing reasons, the judgment of the district court is **AFFIRMED** with respect to the denial of the writ of habeas corpus for the guilt phase and **REVERSED** with respect to the grant of the writ of habeas corpus for the penalty phase.