# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON BRIAN DALTON,

        Defendant-Appellant.

UNPUBLISHED
July 31, 2018

No. 338792
Kalamazoo Circuit Court
LC No. 2016-000287-FC

Before: HOEKSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

Defendant appeals as on leave granted[1] the trial court's partial denial of his motion to suppress statements made to law enforcement officers during two interviews after his arrest. Because the trial court should have suppressed all of defendant's statements made during both the first and second interrogations, we reverse the partial denial of defendant's motion and remand for further proceedings.

Defendant stands charged with six counts of open murder in violation of MCL 750.316, two counts of assault with intent to murder in violation of MCL 750.83, and eight counts of carrying a firearm during the commission of a felony (felony-firearm) in violation of MCL 750.227b. The charges arise from shootings at three separate locations in Kalamazoo County, Michigan on the evening of February 20, 2016. The shootings occurred at an apartment complex, a car dealership, and a restaurant. Defendant was arrested in the early morning hours of February 21, 2016 and transported to the Kalamazoo Department of Public Safety (KDPS). After his arrest, defendant was interrogated at KDPS for more than 3 hours, beginning at approximately 1:00 a.m. on February 21, 2016. Following this first interrogation, defendant was transported to the Kalamazoo County Jail. Later that same day, in the afternoon, defendant was interrogated a second time at the Kalamazoo County Sheriff's Department by a detective of the Michigan State Police. Defendant made incriminating statements during both interrogations.

In the trial court, defendant moved to suppress the incriminating statements he made to law enforcement during both interviews. The trial court granted defendant's motion to suppress

---

[1] *People v Dalton*, 501 Mich 1025 (2018).

in part and denied it in part. Specifically, the trial court suppressed the majority of defendant's statements made during the first interview because the police failed to scrupulously honor defendant's invocation of his right to remain silent; however, the trial court denied defendant's motion with regard to certain statements made during the first interview that the trial court concluded were elicited under the public safety exception to *Miranda*.[2] With regard to the second interview, the trial court concluded that defendant's statements during the second interview were admissible because, although defendant invoked his right to an attorney and initially declined to waive his *Miranda* rights, defendant changed his mind, initiated a discussion with police, and thereafter voluntarily waived his rights.

The case is now before us on an interlocutory basis for consideration as on leave granted. On appeal, defendant contends that the trial court should have suppressed all of his incriminating statements made during the first and second interrogations.

## I. STANDARDS OF REVIEW

When reviewing a decision on a motion to suppress, we review for clear error a trial court's findings of fact. *People v Elliott*, 494 Mich 292, 300; 833 NW2d 284 (2013). "To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Tanner*, 496 Mich 199, 206; 853 NW2d 653 (2014) (quotation marks and citation omitted). We review de novo a trial court's determination that a waiver of Fifth Amendment rights was voluntary, knowing, and intelligent. *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). We review de novo a trial court's ultimate decision on a motion to suppress. *People v Lapworth*, 273 Mich App 424, 426; 730 NW2d 258 (2006).

## II. THE FIRST INTERVIEW

On appeal, defendant argues that the public safety exception does not apply to the first interview, meaning that the trial court erred by admitting any of defendant's statements from the first interview based on the public safety exception. Instead, defendant contends that all of his statements during the first interview must be suppressed because defendant invoked his right to remain silent and the police failed to scrupulously honor this right. We agree.

### A. FACTUAL BACKGROUND

At approximately 1:00 a.m. on February 21, 2016, defendant was brought into an interview room at KDSP. Upon entering the room with Detectives William Moorian and Cory Ghiringhelli, defendant was searched, his handcuffs were removed, he was allowed to take off his coat and remove a bullet proof vest, and he was offered food, drink, and the use of a bathroom. The detectives left defendant alone for a minute or so, and when they returned, they reintroduced themselves to defendant and gave defendant a Coke. After the introductions were made, Detective Moorian stated:

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

I don't know anything about you. I'll be honest with you, I just learned your name just a few moments ago when we were downstairs. So we don't know anything about nothing. I can tell you this much, we both have been doing this a long time and I don't know your involvement with the police at all. Have you ever had - - well, I'm not going to ask you that. But it's just - - obviously things happen for a reason and everybody does something for a reason, and I think that we would like to know kind of why some certain things have happened and what's going on - - and what's going on in your life, you know. That's something that we're interested in. Does that sound good?

Defendant agreed, and after informing defendant that he was not free to leave, Detective Moorian then advised defendant of his *Miranda* rights.

At the conclusion of the *Miranda* warnings, Detective Moorian asked defendant whether it was "okay if we talk?" Defendant responded that he would "kind of prefer not to talk." The following exchange then took place:

*Det. Moorian*: Okay. All right. You'd prefer not to talk. How about let me ask you this, like I said, everything happens for a reason and only you can explain to us what was going on with you today. Do you know what I mean?

[*Defendant*]: Yeah.

*Det. Moorian*: Only you can. Nobody else. And I don't think you want anybody else talking for you. Do you know what I mean?

[*Defendant*]: Yeah.

*Det. Moorian*: Only—

[*Defendant*]: I would prefer not to say anything.

*Det. Moorian*: Okay. Any reason?

[*Defendant*]: It just would be better to not say nothing.

*Det. Moorian*: Really? Okay.

(Unintelligible.)

*Det. Ghiringhelli*: Yeah.

*Det. Moorian*: Do you feel—let me ask you this, can you answer one question right now? Do you feel bad for what happened tonight to all these people?

[*Defendant*]: I'd like to just not say anything.

*Det. Moorian*: Okay.

-3-

Although defendant plainly stated that he wanted to "not say anything," the interrogation continued. During the ensuing three hours of questioning, approximately 40 times, defendant communicated to the police that he would "prefer not to say anything," that he "really [didn't] want to talk about anything," that he was "not interested in talking about anything," that he would "like to just not talk," that he wanted to "keep [his] mouth shut," and that he wanted to "plead the Fifth."[3]

Yet, the detectives undisputedly interrogated defendant. In the course of the interrogation, among other topics, police questioned defendant about the shootings, his motivation for the shootings, the victims who had been killed in the shootings, whether he felt "bad" for the shootings as well as topics relating to defendant's family, his hobbies, his dog, and his job. They repeatedly urged defendant to explain his actions, emphasizing the community's need for "closure" and "answers." Although the interview began with Detectives Moorian and Ghiringhelli, Detective Ghiringhelli was later replaced by Sergeant Don McGhee of the Kalamazoo Sheriff's Department, who was personally acquainted with defendant. Sergeant McGhee and Detective Moorian questioned defendant for over an hour. After Sergeant McGhee left, defendant was again questioned by Detectives Moorian and Ghiringhelli. During the course of the interrogation, defendant implicated himself in the shooting at the restaurant, though he maintained that his body was being controlled by "an artificial intelligence." Defendant stated that he did not recall the shootings at the other two locations.

Notably, after defendant had been read his *Miranda* rights and after he informed police that he did not want to talk, in the course of their other questions, the detectives raised subjects relating to the possibility of other unknown victims or other unidentified crime scenes. First, approximately 11 minutes into the interrogation, police asked defendant if he knew of anyone else who might need medical attention, and defendant answered "no." Second, over an hour into the interview, police asked defendant several questions about the number of shooting locations, whether they might be missing a location, and whether it was possible there was "somebody laying in a ditch somewhere" in need of medical attention. In response to these questions, defendant stated that he wanted to "plead the Fifth," but he also made a potentially incriminating statement by indicating that he knew "for a fact" that no one was in a ditch in need of help. Third, and finally, more than three hours into the interview, after defendant had implicated himself in the restaurant shooting, police asked whether they should drive by a certain road— where defendant stated that he saw people dressed in black—to make sure that no one in the area was hurt, and defendant responded "Yeah," though earlier defendant said that he knew he had

---

[3] Defendant suggests on appeal that his attempt to "plead the Fifth" should be read to indicate an invocation of his right to remain silent as well as an invocation of his right to counsel. While defendant's expression of his desire to "plead the Fifth" unequivocally conveyed his invocation of his right to remain silent, cf. *Anderson v Terhune*, 516 F3d 781, 784 (CA 9, 2008) (en banc), this statement cannot reasonably be construed as an unequivocal expression of defendant's desire for the assistance of an attorney. See generally *People v Adams*, 245 Mich App 226, 237; 627 NW2d 623 (2001). With regard to the first interview, defendant invoked only his right to remain silent.

not shot the people in question. After more than three hours, the interrogation finally concluded at approximately 4:10 a.m. Defendant was then transported to the Kalamazoo County Jail.

## B. ANALYSIS

"The United States Constitution and the Michigan Constitution both prohibit 'compelled' self-incrimination." *Elliott*, 494 Mich at 301 n 4, quoting US Const, Am V; Const 1963, art 1, § 17. Before a suspect is subject to custodial interrogation, the suspect must be given the now-familiar *Miranda* warnings; specifically, the suspect must be informed "(1) that he has the right to remain silent, (2) that anything he says can and will be used against him in court, (3) that he has a right to the presence of an attorney during any questioning, and (4) that if he cannot afford an attorney one will be appointed for him." *People v Daoud*, 462 Mich 621, 625 n 1; 614 NW2d 152 (2000). "When a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him," provided that the waiver of rights is voluntary, knowing, and intelligent. *Tanner*, 496 Mich at 209.

In comparison, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Michigan v Mosley*, 423 US 96, 104; 96 S Ct 321; 46 L Ed 2d 313 (1975) (quotation marks omitted). The right to remain silent and to cut off police questioning are considered critical safeguards against compelled self-incrimination, and an accused may exercise these rights at any time by unequivocally asserting that he or she wishes to remain silent. *People v Henry (After Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014). "When a defendant invokes his or her right to remain silent, the police must 'scrupulously honor' the defendant's request." *Id.*, quoting *Mosley*, 423 US at 103-104. "The police fail to scrupulously honor a defendant's invocation of the Fifth Amendment right by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Henry*, 305 Mich App at 145 (quotation marks and citation omitted).

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. [*Mosley*, 423 US at 100-101, quoting *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966).]

Consequently, "[i]f the police continue to 'interrogate' the defendant after he has invoked his right to remain silent, and the defendant confesses as a result of that 'interrogation,' the confession is inadmissible." *People v White*, 493 Mich 187, 194; 828 NW2d 329 (2013).

In this case, during the first interview, defendant was undisputedly "in custody" for purposes of *Miranda*, see *People v Cortez (On Remand)*, 299 Mich App 679, 691-692; 832 NW2d 1 (2013), and the detectives did in fact advise defendant of his *Miranda* rights at the outset of the interview. However, rather than waive his rights, defendant unequivocally, and

repeatedly, asserted his right to remain silent. Yet, in the antithesis of scrupulously honoring defendant's right to remain silent, the detectives flagrantly disregarded defendant's request to cut off questioning and instead interrogated him for over three hours.[4] Defendant's incriminating statements, obtained during a custodial interrogation after defendant invoked his right to remain silent, are inadmissible. See *White*, 493 Mich at 194.

On appeal, the prosecutor concedes that defendant unambiguously invoked his right to remain silent during the first interview, but the prosecutor asserts that the detectives' continued interrogation of defendant was permissible under the public safety exception, and the prosecutor contends that the trial court did not err by admitting defendant's statements elicited by questions relating to public safety concerns. This argument is without merit. Under the public safety exception to *Miranda*, law enforcement officers may question an accused person without advising him of his *Miranda* rights when public safety concerns exist. *New York v Quarles*, 467 US 649, 655-657; 104 S Ct 2626; 81 L Ed 2d 550 (1984). However, for this exception "to apply, the police inquiry must have been an objectively reasonable question necessary to protect the police or the public from an immediate danger." *People v Attebury*, 463 Mich 662, 671-672; 624 NW2d 912 (2001). In other words, the public safety exception is a narrow exception that only applies in cases involving "exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime." *Quarles*, 467 US at 658-659 & n 8. Indeed, *Quarles* "drew a specific distinction between questions objectively necessary to secure the public safety and those with an investigatory purpose, explaining that only the former can trigger application of the public safety exception." *Attebury*, 463 Mich at 670.

As an example of the application of the public safety exception, in *Quarles*, while "in the very act of apprehending a suspect," the police "were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Quarles*, 467 US at 657.

> So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it. [*Id.*]

Faced with this exigency, the police officer "asked *only* the question necessary to locate the missing gun before advising respondent of his rights." *Quarles*, 467 US at 659 (emphasis added). In these circumstances, the Supreme Court concluded that the officer's failure to inform the suspect of his *Miranda* rights before asking the question about the gun was justified in the interests of public safety. *Id.* at 657-659. Similarly, in *Attebury*, 463 Mich at 674, the Michigan Supreme Court applied the public safety exception to police questions about the location of a gun at the time of the suspect's arrest because the questions asked by the police "related solely to

---

[4] Interrogation occurs when a defendant " 'is subjected to either express questioning or its functional equivalent.' " *White*, 493 Mich at 195, quoting *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). It is undisputed that defendant was subjected to interrogation during the first interview.

neutralizing" the immediate danger posed by the gun. In applying the exception, the Court distinguished investigatory questions from public safety questions, emphasizing that "[t]he officers *only* asked about the whereabouts of the gun and not other broader questions relating to investigation of the crime." *Id*. (emphasis added).

In contrast to *Quarles* and *Attebury*, in this case, the detectives' disregard of defendant's invocation of his right to remain silent, and their three hour interrogation of defendant while defendant was in custody at the police station, is not justified based on the public safety exception. Quite simply, the detectives' questions to defendant clearly served an investigatory purpose and their questions cannot be categorized as objectively necessary to secure the public safety. The interrogation took place after defendant's arrest, in an interview room at KDSP where defendant posed no immediate danger to the officers or the public. In conducting the interview, the detectives plainly saw no exigency requiring immediate police action. See *Quarles*, 467 US at 658-659 & n 8. If there were any exigency requiring immediate police action, one would expect—as happened in *Quarles* and *Attebury*—that the police would hasten to ask pertinent questions relating to an imminent identifiable threat. Instead, the police took five minutes to introduce themselves, get defendant a Coke, remove his handcuffs, and let him remove clothing to get more comfortable. The police then took the time to Mirandize defendant,[5] and Detective Moorian began the interview by making plain the investigatory nature of the interrogation, stating that "thing happens for a reason" and they wanted to know "why" defendant had done certain things. During the course of the interview, the police then asked defendant a variety of questions about the shootings. Viewed objectively, the interrogation served an investigatory purpose, and it was not prompted by public safety concerns.

It is true that, during the three hour interview, the police occasionally touched on matters relating to the possibility of unidentified shooting locations and unknown injured persons who might be in need of medical assistance. The trial court concluded, and the prosecutor argues on appeal, that defendant's answers to these specific questions may be extracted from the larger interview and admitted at trial based on the public safety exception. But, the prosecutor provides no authority for the proposition that questions touching on public safety concerns can be extracted piecemeal from a three hour investigatory interrogation and justified under the public

---

[5] Defendant argues on appeal that *Quarles*'s public safety exception only excuses an officer's failure to give *Miranda* warnings before asking a question, meaning that the public safety exception could never apply after a suspect has been given *Miranda* warnings. We are not aware of a Michigan case to apply the public safety exception after a suspect has been read the *Miranda* warnings. Other courts have concluded that, in certain circumstances, the public safety exception may apply after a suspect has been read the *Miranda* rights and invoked those rights. See, e.g., *Trice v United States*, 662 A2d 891, 895 (DC, 1995); *United States v Mobley*, 40 F3d 688, 692 (CA 4, 1994); *United States v DeSantis*, 870 F2d 536, 541 (CA 9, 1989). See also *State v Melendez*, 423 NJ Super 1, 25; 30 A3d 320 (2011) (compiling cases). However, we need not decide whether the public safety exception only excuses the giving of *Miranda* warnings, or whether it may also apply post-*Miranda,* because an extension of the public safety exception to post-*Miranda* questioning is certainly not justified on the facts of this case.

safety exception. To the contrary, the public safety exception's application is limited to situations when the *only* questions asked relate *solely* to neutralizing an immediate danger. See *Quarles*, 467 US at 659; *Attebury*, 463 Mich at 674. The fact that numerous broader questions relating to the investigation of the shootings were also asked in this case is a clear indication that the public safety exception does not apply. Cf. *Quarles*, 467 US at 659; *Attebury*, 463 Mich at 674. Indeed, considering the three hour interview, the vast majority of questions had nothing to do with public safety, and in the context of the interrogation at a whole, it is plain that the purported public safety questions—most of which came late in the interview—were simply another means of interrogation, i.e., another means of eliciting incriminating statements from defendant.[6] Overall, the prosecution's reliance on the public safety exception is untenable. The public safety exception does not apply to the first interrogation, and the trial court erred by admitting any of defendant's statements from the first interrogation.

### III. THE SECOND INTERVIEW

Defendant also asserts that his statements during the second interrogation with Detective Sergeant Kyle Gorham of the Michigan State Police should have been suppressed because authorities did not honor his invocation of his rights. In particular, defendant emphasizes that he invoked his right to remain silent during the first interrogation, and he contends that because his invocation was not scrupulously honored, his purported waiver of his *Miranda* rights during the second interview cannot be considered valid in light of the first interview. Moreover, defendant argues that the police only compounded their failure to honor his invocation of his rights during the first interview by failing to honor his unambiguous invocation of his right to counsel at the beginning of the second interview. Emphasizing that Detective Gorham continued conversing with defendant and did not leave the interview room when defendant invoked his right to counsel, defendant contends that he was at all times subjected to custodial interrogation during the second interview and that, because the interrogation never ceased, it cannot be concluded that defendant initiated a discussion of the case with Detective Gorham. In these circumstances,

---

[6] As a comparison, in both *Quarles* and *Attebury*, the Courts distinguished the brief questioning in those cases, which related directly to an immediate danger, from the facts in *Orozco v Texas*, 394 US 324; 89 S Ct 1095; 22 L Ed 2d 311 (1969). Specifically, the *Quarles* Court noted that the police questioning in *Orozco* involved questions that related "in part" to the "whereabouts of a gun." *Quarles*, 467 US at 659 n 8. However, more generally, the police "vigorously" interrogated the suspect "about whether he had been present at the scene of the shooting and whether he owned a gun." *Id*. The Supreme Court suppressed *all* of the suspect's statements in *Orozco*, and in *Quarles*, the Court remarked that "the questions about the gun were clearly investigatory; they did not in any way relate to an objectively reasonable need to protect the police or the public from an immediate danger associated with the weapon." *Id*. Or, as explained by the Michigan Supreme Court, the questioning in *Orozco* was not justified by the public safety exception because it "included general investigation." *Attebury*, 463 Mich at 674. The present case is like *Orozco* in that, even if there were some questions potentially bearing on matters of public safety, the interrogation as a whole involved "general investigation." *Id*. As in *Orozco*, all of defendant's statements during this improper interrogation must be suppressed.

defendant argues that his alleged waiver of his *Miranda* rights during the second interview was presumptively involuntary and inherently invalid. We agree.

## A. FACTUAL BACKGROUND

Following the first interrogation, which concluded at approximately 4:10 a.m. on February 21, 2016, defendant was transported to the Kalamazoo County Jail. Later that same day, beginning at approximately 2:25 p.m., while still in custody, defendant was interviewed a second time, this time by Detective Gorham of the Michigan State Police. The second interrogation took place in an interview room at the Kalamazoo County Sheriff's Department.

A few minutes into his conversation with defendant—after asking how defendant was being treated, correcting defendant's mistaken assumption that he was defendant's lawyer, providing defendant with a Coke, asking if defendant was a "religious man," and obtaining basic background information about defendant—Detective Gorham began to Mirandize defendant. As Detective Gorham went through the *Miranda* rights, defendant acknowledged that he understood each of the rights, though he stated that he was "surprised" by "the questions and stuff." The discussion continued as follows:

> *Det. Gorham*: If you waive your right to have a lawyer present and later change your mind the questions will stop until you talk with a lawyer.
>
> [*Defendant*]: Yeah.
>
> *Det. Gorham*: Okay.
>
> [*Defendant*]: I think I probably need to talk to a lawyer.
>
> *Det. Gorham*: Okay. So you want to talk to an attorney before you speak with me about anything?
>
> [*Defendant*]: Yeah. It'd probably be nice, yes.
>
> *Det. Gorham*: Okay. All right. Do you understand that—
>
> [*Defendant*]: I—I trust you, but there's things that are different now.
>
> *Det. Gorham*: Oh, I don't disagree with you, Jason. You know, I want you to—I'll be honest with you, from a person—from man to man here, we have a lot of things to consider here, okay? And I'm glad that you at least acknowledge me trying to do the right thing here.
>
> [*Defendant*]: Yeah.
>
> *Det. Gorham*: Okay. The thing that I'll share with you is sometimes there is a—obviously there's always a lot of unanswered questions, but in your situation, sir, you're just like me. You're just an average Joe trying to make it through life.

[*Defendant*]: Yeah.

*Det. Gorham*: And, unfortunately, you have responsibilities at home, you know.

[*Defendant*]: Yeah.

*Det. Gorham*: And you have—those folks have some questions.

[*Defendant*]: Yeah.

*Det. Gorham*: And probably shedding a lot of tears that dad didn't come home today.

[*Defendant*]: I would imagine so.

*Det. Gorham*: You know what I mean?

[*Defendant*]: Yeah.

*Det. Gorham*: So, I mean, you can—I'm not here to convince you one way or the other. If you want to wish like you just said that you want to speak with an attorney first can I—there's two more lines on this thing. Can I read those to you and you can just tell me what you want to do from there?

[*Defendant*]: Right.

*Det. Gorham*: Is that fair?

[*Defendant*]: That's fair.

*Det. Gorham*: Okay. Do you understand each of the rights that I've explained to you today, sir?

[*Defendant*]: Yes.

*Det. Gorham*: Okay. And I'll just simply ask you this last statement and you can do what you want to do. Are you willing to give up these rights and answer my questions at this time?

[*Defendant*]: No.

*Det. Gorham*: Okay. All right. That is no problem. I'm just going to stay here and have a Coke with you.

[*Defendant*]: All right.

*Det. Gorham*: And then I'll have them come take you back to your cell. So I'm not talking about anything like that. You okay to talk about stuff?

-10-

[*Defendant*]:  Yeah, we can talk about stuff.

*Det. Gorham*:  Okay.  What do you like to do?

[*Defendant*]:  I like to—I like to go to the dog park a lot.

Detective Gorham then engaged defendant in an approximately 10 minute conversation regarding dogs—training dogs, breeding dogs, tracking with dogs, Detective Gorham's own experiences with dogs, defendant's German Shepherd, and defendant's relationship with his dog. Toward the end of this discussion about dogs, the following exchange took place:

*Det. Gorham*:  Yeah, it's good though.  You know, the hardest thing is obviously they pass on and it's just like losing a family member, you know?

[*Defendant*]:  Right.

*Det. Gorham*:  It's just devastating, you know.

[*Defendant*]:  Sure.

*Det. Gorham*:  So—well, before—

[*Defendant*]:  What kind of questions did you want to ask me?  If you just want to ask me.

*Det. Gorham*:  I had—I have a gamut of stuff that I want to—because I want to understand.  I am a person—I'll tell you what I do.  I talk to people all day long.  You know, that's primarily what I do.

[*Defendant*]: Yeah.

*Det. Gorham*:  You know, and that's—I'm not out on the street.  I'm in an office.  Everybody usually comes to me and talks to me in my office.

[*Defendant*]: Right.

*Det. Gorham*: But, you know, in terms of any types of questions, you know, like I said, I got—if I said I only had one type of question I'd be lying to you.  I have a herd—a boat load of questions.

[*Defendant*]:  Sure.  Sure.

*Det. Gorham*:  Stuff I just want to understand and try to understand you, you know.

[*Defendant*]:  Right.

Detective Gorham made a several more general remarks relating to "people beside professionals" wanting to understand what happened, being metaphorically "kicked down in the cellar" and trying to get out with God's help, and the value of acknowledging problems and reflecting on

-11-

past events. Detective Gorham also stated that he wished he could have met defendant 24-hours before and that he felt bad for the victims, for defendant, and for defendant's family. After defendant again confirmed that he was being treated "okay," the following exchange took place:

> *Det. Gorham*: Good. Well, those guys from the (unintelligible) there. Those guys in the sheriff's department uniform. Well, Jason, I have to make a quick phone call. And I'm just being honest with you, okay, because initially you said that you don't want to talk to me.
>
> [*Defendant*]: Yeah, but I do.
>
> *Det. Gorham*: Okay. You know, I have to—
>
> [*Defendant*]: I do, but—
>
> *Det. Gorham*: Okay. Let me just call and see how they—how they would feel about that. Maybe it's something if I have to go back over your rights again.
>
> [*Defendant*]: Would you do that for me, sir?
>
> *Det. Gorham*: Absolutely. I'm not in no hurry here today. So—I'd appreciate it if we could talk.
>
> [*Defendant*]: I would—I would like that very much.
>
> *Det. Gorham*: Okay. Let me—just stay seated. I got to step out. I'll make a phone call and come back and let you know, okay?

Detective Gorham left defendant alone in the room for a few minutes. When Detective Gorham returned, he again advised defendant of his *Miranda* rights, and defendant indicated that he understood those rights. This time, when asked if he was willing to give up these rights and answer questions, defendant responded "yes." During the interrogation that followed, defendant implicated himself in the shootings at all three locations in Kalamazoo County, though he again indicated that his body had been taken over. In total, the second interrogation lasted approximately four hours.

## B. ANALYSIS

Considering the facts of this case, we conclude that the trial court erred by refusing to suppress defendant's statements during the second interview. First, in our view, by initiating the second interrogation despite the repeated violation of defendant's right to remain silent during the first interview, law enforcement failed to scrupulously honor defendant's invocation of his right to remain silent, and defendant's statements during the second interview must therefore be suppressed. Second, even supposing that Detective Gorham could approach defendant for a second interview, the record shows that defendant unequivocally invoked his right to counsel and again unequivocally invoked his right to remain silent. Yet, Detective Gorham ignored defendant's invocation of his rights and continued to interrogate defendant, meaning that defendant's statements during the second interview must also be suppressed on this basis.

-12-

## i. INITIATING A SECOND INTERROGATION AFTER DEFENDANT INVOKED HIS RIGHT TO REMAIN SILENT DURING THE FIRST INTERROGATION

Given defendant's unequivocal invocation of his right to remain silent during the first interview and the authorities' total disregard for this invocation, we agree with defendant's assertion that the second interrogation was improper from its inception. As noted, under *Mosley*, once a suspect in custody has invoked the right to remain silent, the interrogation must cease and the admissibility of any statements made after an in-custody suspect invokes the right to remain silent depends on whether the police "scrupulously honored" the suspect's decision to cut off questioning. *Mosley*, 423 US at 100-101, 104. However, the *Mosley* Court was also clear that the right to cut off questioning under *Miranda* does not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id*. at 102-103. Instead, when a suspect invokes the right to remain silent, "the police must cease all questioning at that interview but can then initiate a subsequent interrogation *if* law enforcement officials 'scrupulously' honor the defendant's assertion of the right to remain silent." *People v Crusoe*, 433 Mich 666, 683 n 25; 449 NW2d 641 (1989) (emphasis added).

The scrupulously honored standard does not involve "black-and-white line drawing;" rather, whether questioning can be properly reinitiated after a suspect invokes the right to remain silent depends on the circumstances of each particular case. *People v Slocum (On Remand)*, 219 Mich App 695, 701; 558 NW2d 4 (1996). Although not intended as an exhaustive list of factors, the *Mosley* Court identified several circumstances relevant to a determination of whether authorities initiating a second interrogation after a suspect invokes his or her right to remain silent have scrupulously honored the suspect's assertion of his or her right to remain silent. See *id*. at 701-702. Specifically, in finding that the police had scrupulously honored the defendant's rights in *Mosley*, the Court emphasized that (1) the police "immediately ceased the [original] interrogation and did not try either to resume the questioning or in any way to persuad [the suspect] to reconsider his position," (2) the police waited for a significant interval of "more than two hours" before approaching the suspect a second time, (3) the suspect was again given the *Miranda* warnings at the start of the second interview, and (4) the second interrogation related to a different crime than the first interview and the second interview was conducted by a different police officer. *Mosley*, 423 US at 105. Summarizing these circumstances, the *Mosley* Court concluded:

> This is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation. [*Id*. at 105-106.]

The present case bears little resemblance to *Mosley*. Most significantly, unlike *Mosley*, the police in this case did not "immediately" cease the original interrogation. To the contrary, as discussed, they continued to question defendant for a prolonged period of time and they actively

-13-

tried to persuade defendant to reconsider his decision to invoke his right to remain silent.[7] Indeed, the police's deliberate disregard of defendant's invocation of his right to remain silent during the first interview cannot be overstated. Approximately 40 times, defendant stated that he wished to remain silent. Nevertheless, in the face of this invocation, Detectives Moorian and Ghiringhelli interrogated defendant. Defendant was then interrogated by Detective Moorian and Sergeant McGhee. After Sergeant McGhee left the interview room, Detectives Moorian and Ghiringhelli again interrogated defendant. This was not a "brief period of initial questioning." Cf. *Mosley*, 423 US at 106-107. In total, despite his repeated invocation of his right to remain silent, defendant was interviewed for over three hours, and in the face of this custodial interrogation, defendant did in fact incriminate himself. In short, unlike *Mosley*, 423 US at 105, this is clearly a case "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."

In our view, given the police's complete disregard of defendant's invocation of his right to remain silent, Detective Gorham's second interrogation on the afternoon of July 21, 2016 cannot be justified under *Mosely*. It is true that the second interrogation began approximately 10 hours after the first interrogation concluded, which is a significant amount of time under *Mosley*, and the second interrogation involved a different police officer and a re-reading of defendant's *Miranda* rights. However, unlike *Mosley*, Detective Gorham's interview related to the same subject matter as the first interrogation and, as discussed, unlike *Mosley*, the police did not immediately cease the original interview but instead ignored defendant's repeated request to cut off questioning and attempted to persuade him to change his mind, giving defendant every reason to believe that the police had no intention of honoring his rights. Cf. *Slocum*, 219 Mich App at 704-705. Against this backdrop, on the afternoon of February 21, 2016, defendant was once again placed in an interrogation room with a police officer who, as discussed in more detail *infra*, sought to have defendant change his mind, waive his rights, and answer questions about the shootings. While no one factor is dispositive under *Mosley*, see *Slocum*, 219 Mich App at 701-702, considering all of the circumstances, the police's blatant—and prolonged—refusal to honor defendant's invocation of his right to remain silent during the first interrogation is so completely antithetical to *Miranda* and the right to remain silent that, despite the passage of several hours and the re-reading of defendant's *Miranda* warnings,[8] Detective Gorham's

---

[7] During the first interrogation, the police asked defendant for the "reason" he was invoking his right to remain silent. The authorities insisted that defendant owed it to his family, the victims' families, and the community to provide "answers" and "closure." They urged him not to let someone else tell his story and to instead tell his side of the story so that he did not look like a "monster." They suggested that talking would do some "good," that it would "help" defendant to talk, and that it would make defendant "feel better" to talk.

[8] "[P]olice cannot, as if by alchemy, negate [a suspect's] invocation of his right to remain silent by mantra-like recitation of *Miranda* warning." *United States v Lafferty*, 503 F3d 293, 307 (CA 3, 2007) (quotation marks and citation omitted). "In fact, [t]he more times police inform a suspect of his rights in the face of his repeated invocation of one of those rights . . . the clearer it

-14-

subsequent initiation of an interrogation cannot meet the scrupulously honored standard under *Mosley*. Instead, on the facts of this case, Detective Gorham's interrogation of defendant was just another round in the authorities' persistent efforts to wear down defendant's resistance and undermine his will. See *Mosley*, 423 US at 102; *Slocum*, 219 Mich App at 704-705. Because the authorities did not scrupulously honor defendant's invocation of his right to remain silent, his statements during the second interrogation must also be suppressed.[9] See *Mosley*, 423 US at 100, 104; *Henry*, 305 Mich App at 148.

## ii. INVOCATION OF RIGHTS DURING THE SECOND INTERROGATION

Even assuming that Detective Gorham's subsequent interrogation on the afternoon of February 21, 2016 could satisfy the scrupulously honored standard under *Mosley*, we would nevertheless conclude that the trial court erred by failing to suppress defendant's statements in the second interview because defendant invoked both his rights to counsel and to remain silent, and Detective Gorham continued to interrogate defendant rather than honor these requests.

As noted, before a suspect is subject to custodial interrogation, the suspect must be given the *Miranda* warnings. *Daoud*, 462 Mich at 625 n 1. "When a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him," provided that the waiver of rights is voluntary, knowing, and intelligent. *Tanner*, 496 Mich at 209. However, as discussed, when a suspect invokes the right to remain silent, "the police must cease all questioning at that interview but can then initiate

---

becomes that the police must not mean what they say. This is exactly the type of subtle coercive pressure which the *Miranda* opinion condemned." *Id.* (quotation marks and citation omitted).

[9] Citing *Oregon v Elstad*, 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222 (1985), the prosecutor asserts on appeal that "statements made in a voluntary confession after an interrogation in violation of the *Miranda* rules are not subject to suppression as fruit of a poisonous tree in the same way physical evidence is excluded under the Fourth Amendment." This argument, made without any further explanation or analysis of the significance of *Elstad* on the facts of this case, is abandoned. See *People v Henry*, 315 Mich App 130, 148; 889 NW2d 1 (2016). Nevertheless, we note briefly that *Elstad* involved two statements by a defendant, the first a voluntary statement made before the defendant had been given *Miranda* warnings and the second a statement given after the defendant had been Mirandized. In these circumstances, the Court concluded that, while the first statement must be suppressed under *Miranda*, the second statement could be admissible, provided that the second statement was voluntary. *Elstad*, 470 US at 309, 314, 317-318. In contrast, in the present case, defendant was given *Miranda* warnings during the first interrogation and he invoked his right to remain silent. The prosecutor provides no authority for the proposition that *Elstad* applies to a second interrogation that follows an invocation of the right to remain silent. Instead, when *Miranda* warnings have been given and the right to remain silent has been invoked during the first interrogation, the initial question with regard to a second interrogation is whether the second interrogation can meet *Mosley*'s scrupulously honored requirement. See *United States v Tyler*, 164 F3d 150, 158 & n 13 (CA 3, 1998). The second interrogation in this case does not meet this standard.

a subsequent interrogation if law enforcement officials 'scrupulously' honor the defendant's assertion of the right to remain silent." *Crusoe*, 433 Mich at 683 n 25.

In comparison to the *Mosley* rule that allows police to re-approach a suspect who has invoked the right to remain silent, a suspect in custody who has expressed "his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981). "In the absence of such a bright-line prohibition, the authorities through badger[ing] or overreaching—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v Illinois*, 469 US 91, 98; 105 S Ct 490; 83 L Ed 2d 488 (1984) (quotation marks and citation omitted). Consequently, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id*. at 95.

An accused "initiates" further communication with law enforcement when he makes a statement that evinces a "willingness and a desire for a generalized discussion about the investigation" that could "reasonably have been interpreted by the officer as relating generally to the investigation." *Oregon v Bradshaw*, 462 US 1039, 1045-1046; 103 S Ct 2830; 77 L Ed 2d 405 (1983). However, statements that are merely "a necessary inquiry arising out of the incidents of the custodial relationship" do not amount to an initiation of further communication with police for purposes of restarting interrogation. *Id*. at 1046. Moreover, to conclude that a suspect has initiated further communication with police about the investigation, there must of course have been a break in the interrogation. See *Christopher v Florida*, 824 F2d 836, 845 n 22 (CA 11, 1987) (noting that police cannot "continue a custodial interrogation despite a request to stop in the hope that the suspect will eventually ask a question").

"For purposes of *Miranda,* interrogation refers to express questioning or its 'functional equivalent.' " *People v Kowalski*, 230 Mich App 464, 479; 584 NW2d 613 (1998), quoting *Rhode Island v Innis*, 446 US 291, 300-301; 100 S Ct 1682; 64 L Ed 2d 297 (1980). "The functional equivalent of interrogation includes any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Kowalski*, 230 Mich App at 479 (quotation marks and citation omitted). Thus, not all communications between police and a suspect constitute custodial interrogation. *Id*. at 480.

> Communications between police and a suspect in custody are commonplace. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly "initiate" renewed interrogation by engaging in routine conversations with suspects about unrelated matters. *And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney.* [*Id*. (quotation marks and citation omitted; emphasis in *Kowalski*).]

Depending on the circumstances, "casual conversation" or "small talk" also may not constitute interrogation or its functional equivalent. See, e.g., *Mickey v Ayers*, 606 F3d 1223, 1235 (CA 9, 2010); *United States v Goist*, 59 Fed App'x 757, 763 (CA 6, 2003).

In this case, Detective Gorham asked defendant whether he wanted to talk to an attorney before speaking "about anything," and it is undisputed that defendant unequivocally invoked his right to counsel by responding "Yeah. It'd be probably be nice, yes." Despite this invocation, Detective Gorham did not end the interview. Instead, he discussed defendant's "responsibilities at home," the "folks" who have questions, and defendant's children "shedding a lot of tears that dad didn't come home today." While it is a bright-line rule that all questioning must cease after an accused requests counsel, Detective Gorham then asked whether he could finish reading the *Miranda* warnings so that defendant could tell him what he wanted to do from there. Cf. *Smith*, 469 US at 93, 98. After finishing the *Miranda* rights, Detective Gorham asked if defendant was willing to give up his rights and answer questions. Defendant responded "no," thereby also invoking his right to remain silent. See *Henry*, 305 Mich App at 147.

Although defendant had made clear that he did not want to talk about *anything* without an attorney, and despite defendant's invocation of his right to remain silent, Detective Gorham remained in the interview room to "have a Coke" with defendant, and he again asked defendant to talk, asking defendant whether it would be "okay to talk about stuff?" Detective Gorham then began to question defendant about "stuff" by asking what defendant liked to do, and defendant responded that he liked to go to the dog park. Following this reference to the dog park, Detective Gorham engaged defendant in a 10 minute discussion of dogs, asking defendant various questions about his German Shepard and sharing his own experiences with dogs.

According to the prosecutor, there was a break in the interrogation because the discussion of dogs amounted to nothing more than small talk, and thus the prosecutor contends that *defendant* initiated further communication with Detective Gorham when, toward the end of the dog conversation, he asked Detective Gorham what kind of questions he wanted to ask and stated "[i]f you just want to ask me." Contrary to the prosecutor's argument, we are persuaded that the interrogation never ceased. From the outset of the second interrogation, Detective Gorham had made plain that he wanted answers about the shootings. When defendant invoked his rights and refused to answer questions, Detective Gorham did not end the interrogation and he did not give defendant time to consult an attorney. Instead, Detective Gorham and defendant remained in the interrogation room, and Detective Gorham seamlessly kept the conversation moving. Detective Gorham's continued conversations with defendant certainly cannot be described as a "bare inquiry" about "routine" matters, such as an offer of water or to use a telephone. See *Bradshaw*, 462 US at 1045. It is true that Detective Gorham eventually focused his questions on dogs, and in other circumstances, this conversation about dogs might be considered small talk that would not rise to the level of interrogation. See *Mickey*, 606 F3d at 1235; *Goist*, 59 Fed App'x at 763. But, in this case, Detective Gorham specifically acknowledged at the suppression hearing that attempting to form a bond with a suspect was a common interrogation technique to get the

person to "open . . . up."[10]  Significantly, defendant had in fact been subjected to this interrogation technique earlier that same day during the first interrogation when the detectives asked defendant numerous rapport-building type questions about his dog, his family, his hobbies, etc.  In other words, the dog conversation initiated by Detective Gorham in the confines of an interrogation room after defendant invoked his rights cannot be excused as casual conversation. Rather, particularly in light of the first interrogation, an objective observer would clearly conclude that defendant was once again being subjected to the police's efforts to wear down defendant and to persuade defendant to incriminate himself despite his invocation of his rights. See *Smith*, 469 US at 98.  These words and actions, which Detective Gorham should have known were reasonably likely to elicit an incriminating response from defendant, constituted interrogation.  See *White*, 493 Mich at 195-196.  Because the custodial interrogation never ceased, defendant cannot be said to have initiated further communication with Detective Gorham.  Cf. *Christopher*, 824 F2d at 845.  Consequently, defendant's incriminating statements during the second interview, made after he invoked his right to counsel and his right to remain silent, must also be suppressed.  See *Smith*, 469 US at 98; *Mosley*, 423 US at 104.

We reverse the trial court's partial denial of defendant's motion to suppress and remand to the trial court for entry of an order granting defendant's motion to suppress the statements he made in both interviews conducted by law enforcement.  We do not retain jurisdiction.

/s/ Joel P. Hoekstra
/s/ William B. Murphy
/s/ Jane E. Markey

---

[10] When considering whether a suspect has been subjected to interrogation, "the focus must be on the objective manifestation of the officer's words rather than on the officer's subjective intentions in speaking the words." *White*, 493 Mich at 196.  Nevertheless, the police officer's subjective intent may be relevant because "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id*. (quotation marks and citation omitted).